# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **CAVINAUGH L. HUGHES,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15 C 1685 |
| | ) |
| **S.A. GODINEZ**, **TARRY WILLIAMS**, | ) |
| **JERRY BALDWIN**, **CORRECTIONS** | ) |
| **OFFICER MOLDOVAN**, and **JOHN** | ) |
| **DOE CORRECTIONS OFFICERS**, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Cavinaugh Hughes ("Hughes"), formerly an inmate at Stateville Correctional Center ("Stateville") but housed in Pontiac Correctional Center ("Pontiac") at the time he filed this action, has called upon 42 U.S.C. § 1983 ("Section 1983") and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et seq. ("the Act") to sue various Illinois Department of Corrections ("IDOC") personnel in both their individual and official capacities in connection with Stateville's Weapons Violator/Staff Assaulter Program ("Program"). This Court has earlier approved Hughes' application to proceed in forma pauperis and designated a member of the District Court trial bar to serve as counsel on his behalf (Dkt. No. 5).

Now before this Court is a Fed. R. Civ. Proc. ("Rule") 12(b)(6) motion to dismiss brought by S.A. Godinez ("Godinez"), Tarry Williams ("Williams") and Jerry Baldwin ("Baldwin")[1]

_____

[1] Because the current motion was not filed on behalf of all the named defendants, this opinion will refer to Godinez, Williams and Baldwin collectively as "movants." Their memoranda are cited as "G. Mem. --" and "G. Reply Mem. --" and Hughes' is cited as "H. Mem --." Because Hughes does not number all the paragraphs of his Complaint or number his
(continued)

under for failure to state a claim upon which relief may be granted. As mandated by 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), this Court also examines the claims against a corrections officer identified simply as "Moldovan" and the "John Doe" corrections officers.

**Motion To Dismiss Standards**

Under Rule 12(b)(6) a party may move for dismissal for the "failure to state a claim upon which relief can be granted." Familiar Rule 12(b)(6) principles require the district court to accept as true all of Hughes' well-pleaded factual allegations and to view them in the light most favorable to him as the non-moving party (Lavalais v. Vill. of Melrose Park, 734 F.3d 629, 632 (7th Cir. 2013)). And "[c]omplaints filed by unrepresented prisoners are supposed to be construed liberally" (Prude v. Clarke, 675 F.3d 732, 735 (7th Cir. 2012)). But "legal conclusions or conclusory allegations that merely recite a claim's elements" are not entitled to any presumption of truth (Munson v. Gaetz, 673 F.3d 630, 632 (7th Cir. 2012)).

In the past decade the Supreme Court has made an important change in the evaluation of Rule 12(b)(6) motions via what this Court regularly refers to as the "Twombly-Iqbal canon" (a usage drawn from Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), as more finely tuned in Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam), and Ashcroft v. Iqbal, 556 U.S. 662 (2009)). That canon has introduced the concept of "plausibility" into the analysis, and in that respect our Court of Appeals has "interpreted Twombly and Iqbal to require the plaintiff to provide some specific facts to support the legal claims asserted" (McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011) (internal quotation marks and citation omitted)). As

---

(footnote continued)
pages consistently, unnumbered paragraphs will be cited by the page number printed by the Court's electronic filing system rather than Hughes' handwritten ones.

McCauley went on to reconfirm, claimants must set out "enough details about the subject-matter of the case to present a story that holds together" (id.).

Because their focus is on the pleadings, Rule 12(b)(6) motions "can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" (Geinosky v. City of Chicago, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). But a nonmovant has more flexibility, for he "may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings" (see id.).

If a Rule 12(b)(6) motion causes the dismissal of a complaint, courts should usually give a claimant at least one opportunity to amend (Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind., 786 F.3d 510, 519 (7th Cir. 2015)). And consistent with the principles of Rule 15(a)(2), courts generally grant leave to amend freely. But where "it is certain . . . that any amendment would be futile or otherwise unwarranted," the court can deny leave to amend (id. at 520).

**Factual Background**

Until being transferred to Pontiac on August 5, 2014 (Complaint ¶ 74) Hughes was an inmate at Stateville, another correctional facility operated by IDOC (Complaint at 5). At the time of the incidents relevant to this case, Godinez was IDOC's Director, Williams served as Stateville's Chief Administrative Officer and Baldwin acted as the Program's supervising counselor and chairperson (Complaint at 2 and ¶ 92).

On May 3, 2013 a disciplinary committee at Stateville found that Hughes had violated prison rules by possessing a contraband weapon and recommended that he be punished with six months in segregation, demotion to C-grade (which impacts institutional privileges -- 20

Ill. Admin. Code 504.130) and further commissary restrictions (Complaint Ex. 1 at 3). Rather than his being returned to the general prison population once that term was completed, however, Hughes was placed in the Program on November 22, 2013 -- but without any further adjudication by the disciplinary committee -- for an indefinite term that turned out to consume the remainder of his stint at Stateville (after which he was placed in Pontiac's corresponding program, although that is not the subject of this suit (Complaint ¶¶ 1, 4-5, 8; H. Mem. 6 n.1). According to Program regulations his status should have been reviewed after 180 days and every 90 days thereafter, but Hughes was never given a review hearing (Complaint ¶¶ 36-37). Instead he spent a total of 256 days in Stateville's Program without such a hearing (Complaint ¶¶ 58, 65).

In contrast with the general inmate population, prisoners in the Program are housed in a special cell block, take their meals separately from the rest of the prison population and are clothed in a distinctive black-and-white striped jumpsuit (Complaint ¶¶ 9-10, 27). They also have severely restricted visitation, recreational and commissary privileges (Complaint ¶¶ 14-26). Crucially they also cannot (1) attend religious services together with the rest of the prison population or (2) meet with clergy (Complaint ¶¶ 12, 81-82, 85). Instead they are permitted to view a religious service on a closed-circuit monitor, but only one service of a single denomination is available for viewing and in only one language, and even that only intermittently (Complaint ¶¶ 13, 81-82, 85).

Beyond those official aspects of the Program, Hughes also alleges other deprivations that he characterizes as both (1) an unofficial feature of the Program (Complaint ¶¶ 10, 28, 72, 91) and (2) in retaliation for grievances he has filed (Complaint ¶¶ 26(E), 30(B), 42, 42(B), 76, 78). Thus Moldovan and other corrections officers have singled Hughes out for abuse that has included tampering with his food, mail and commissary purchases, oral provocations and varying

levels of physical hostility (Complaint ¶¶ 30-32, 40-41). Because Hughes is allowed to purchase items from the commissary only once per month and only by ordering them for delivery (Complaint ¶¶ 20-26), the commissary's policy of allowing him to accept or reject the shipment only in its entirety requires him to choose between paying for missing or damaged items and forgoing the receipt of all goods from the commissary for the whole month (Complaint ¶¶ 50-51).

There are a number of other indignities that Hughes describes in the Complaint. For example, his cell was given repeated shakedown searches for which he was not always provided a receipt and that resulted in the destruction of his personal property (Complaint ¶¶ 30(A), 76-78) -- including papers he had preserved in anticipation of filing this lawsuit but of which he retained other copies (Complaint ¶ 34). Hughes' food has contained rocks, fingernails, hairs, opened items and "at times vermin fecal matter" (Complaint ¶¶ 27(B)-(C), 46(B)). When breakfast juice from the mess hall was discovered in his cell, it was treated as drug contraband rather than as ordinary food contraband in order (he says) to retaliate against him, as evidenced somewhat paradoxically by his not receiving the severe punishment he would have warranted for a bona fide drug contraband infraction (Complaint ¶ 77). Hughes also recounts an incident from August 5, 2014 ("the August 5 incident") when Moldovan became angry that the lunch line was not moving fast enough, tore an identification card off of Hughes, and then (after Hughes was handcuffed following the resulting scuffle) had Hughes maced repeatedly and then charged with assaulting prison staff (Complaint ¶¶ 74, 79). Hughes alleges that Moldovan and other corrections officers admitted to him that the repeated shakedowns and destruction of his property were in retaliation for his filing grievances (Complaint ¶¶ 30(B), 42, 78).

In response to those deprivations Hughes filed numerous grievances and wrote other letters. Those grievances covered the retaliatory abuse he endured from corrections officers (Complaint ¶¶ 30-30(B), 73-74, 76, 88, 90-91) and the problems with his meals (Complaint ¶¶ 27(A)-(E), 46-46(B)), as well as his less serious difficulties with the commissary (Complaint ¶¶ 26(E), 49) and protests about the Program's features overall (Complaint ¶¶ 72, 83, Ex.1-2). Of those grievances he attaches only one to his Complaint (labeled as both Ex. 1 and Ex. 2), in which he raises his due process, equal protection and double jeopardy objections to how he was put in the Program, drawing attention to his clothing, exercise yard, separate housing and job eligibility.

Hughes avers that movants' enrolling him in the Program constituted an additional punishment for his weapons violation and so offended both the Fifth Amendment's ban on double jeopardy and the Fourteenth Amendment's guaranty of due process (Complaint Counts I and II).[2] Count III further characterizes the inferior privileges afforded to Program participants as an equal protection violation. As for Hughes' inability to attend religious services in person and the closed-circuit system's carrying of only one denomination, he asserts that such treatment violates both the First Amendment's free exercise clause and the Act (Counts VI and VII). Hughes also includes a count for cruel and unusual punishment (Count IV) and argues that defendants showed deliberate indifference to the hostile environment of the prison (Count VIII),

---

[2] As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provisions (which of course impose limitations only on the federal government) rather than to the Fourteenth Amendment, which applies to state actors and has been construed to embody such Bill of Rights guaranties.

also an unmistakable Eighth Amendment claim.[3] Lastly he claims retaliation for the exercise of his constitutional rights (Count V) and alleges facts sounding in a denial of access to the courts.

**Concessions by Hughes and Injunctive Relief**

Since counsel was designated to act for him, Hughes has conceded two issues raised by movants' motion to dismiss. First, because Godinez is no longer the director of IDOC he "is not a proper party in this matter . . . and he should be dismissed from this suit" (H. Mem. 4).[4] Second, Hughes acknowledges that he cannot seek monetary damages under the Act and that because he was transferred to a different prison before he filed this lawsuit he does not have standing to seek the particular injunctive relief that he requests (H. Mem. 4).[5]

While Hughes phrases his concession that he lacks standing to seek injunctive relief in general terms, he does so only in the narrow context of his claims under the Act (H. Mem. 4).

---

[3] Movants' purported inability to "identify any constitutional right of which Plaintiff has been deprived" (G. Reply Mem. 3), offering instead that "hostile environment" calls Title VII employment discrimination to mind and that there is no right to be free from a dangerous prison environment (G. Mem. 4-5), defies a polite characterization. It almost seems as if the same analytical deficit that leads some lawyers to advance such legally bankrupt arguments carries over to make those same lawyers impervious to the realization that the same conduct may well create serious concerns as to their general probity, which in turn can cast a cloud over their otherwise colorable arguments.

[4] When Hughes drafted his Complaint without benefit of counsel, he named Godinez in both his individual and official capacities, and movants argued only that suit against him in his official capacity was improper (G. Mem. 3). It is unclear whether Hughes' counsel consulted with him before conceding that Godinez was not a proper party simpliciter, but given that concession this opinion has no occasion to examine whether the Complaint alleges sufficient facts to render Godinez liable in an individual capacity.

[5] Movants present the issue as one of mootness and Hughes concedes it in those terms. But the "mootness doctrine requires re-evaluating the standing requirements throughout litigation" (Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee, 708 F.3d 921, 929 (7th Cir. 2013) (emphasis added)). Failure to clear that initial hurdle is not mootness but lack of standing.

Because the extent of his concession is ambiguous, this Court holds that (conceded or not) he lacks standing to pursue an equitable remedy on any claim, for absent the realistic prospect of transfer back to Stateville his injuries are not "capable of repetition but avoiding review" (<u>Higgason v. Farley</u>, 83 F.3d 807, 811 (7th Cir. 1996) (per curiam)). And because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" (<u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989)), except where a plaintiff seeks injunctive relief (<u>id.</u> at 71 n.10), Hughes can proceed against the remaining defendants only in their individual capacities.

### **Conduct of Individual Corrections Officers**

On Hughes' account of events (which must be credited on the current motion), a number of Stateville corrections officers and perhaps other personnel have behaved atrociously. Where random and unauthorized behavior offends only procedural due process and in a manner that does not implicate "rights of fundamental fairness," the fact that the defendant is also a state actor does not transform even intentional conduct into a constitutional violation where the plaintiff has an adequate post-deprivation remedy (<u>Armstrong v. Daily</u>, 786 F.3d 529, 539 (7th Cir. 2015)). But an overlapping state remedy is irrelevant to contentions that sound in the specific guaranties of the Bill of Rights or substantive due process (<u>Zinermon v. Burch</u>, 494 U.S. 113, 124-25 (1990)), and at least some of the behavior attributed to Moldovan and the John Doe defendants certainly crossed the line from the merely tortious into the realm of a civil rights violation.

Cruel and unusual punishment is forbidden by the Eighth Amendment. Force may be applied to ensure order, but when "prison officials maliciously or sadistically use force to cause harm" or engage in any significant aggression (except for "<u>de minimis</u> uses of physical force") or

force that is otherwise "repugnant to the conscience of mankind," that violates the Constitution regardless of whether serious injury results (Hudson v. McMillian, 503 U.S. 1, 8-10 (1992)). And Prude, 675 F.3d at 734 (citation omitted) also makes it clear that conduct other than physical force may run afoul of the same constitutional guaranty:

> Deliberate withholding of nutritious food or substitution of tainted or otherwise sickening food, with the effect of causing substantial weight loss, vomiting, stomach pains, and maybe an anal fissure (which is no fun at all), or other severe hardship, would violate the Eighth Amendment.

Nor may prison officials impede a prisoner's efforts to pursue legal claims without violating the constitutional right of access to the courts. As Ortiz v. Downey, 561 F.3d 664, 671 (7th Cir. 2009) states:

> That right is violated when a prisoner is deprived of such access and suffers actual injury as a result.

Not every delay is constitutionally significant, however, and "regardless of the length of an alleged delay, a prisoner must show actual substantial prejudice to specific litigation" (Gentry v. Duckworth, 65 F.3d 555, 559 (7th Cir. 1995)).

Relatedly,[6] as Hoskins v. Lenear, 395 F.3d 372, 375 (7th Cir. 2005) (per curiam) has reconfirmed, "[p]risoners are entitled to utilize available grievance procedures without threat of recrimination." All that is required to state a prima facie case for retaliation is "that a protected activity . . . was at least a motivating factor in retaliatory action" (Mays v. Springborn, 575 F.3d 643, 650 (7th Cir. 2009) (per curiam)). Violations of prison rules can be evidence of an intent to harass (id.), and even "otherwise permissible conduct can become impermissible when done for retaliatory reasons" (Zimmerman v. Tribble, 226 F.3d 568, 573 (7th Cir. 2000)).

---

[6] Note the exhaustion-of-remedies provision of 42 U.S.C. § 1997e(a).

Because Moldovan and the John Doe defendants directly admitted that they were damaging Hughes' property during shakedowns and conducting them more frequently because Hughes filed grievances (Complaint ¶¶ 42, 78), Hughes has clearly stated a claim for relief. Thus conduct that would otherwise be outside of constitutional protection, either because Hughes has an adequate post-deprivation remedy (the irregular shakedowns, destruction of personal property and nonconforming shipments from the commissary) or because the use of force was de minimis (the majority of the pokes, shoves and provocations) is nonetheless actionable. And while the admission touched only on the shakedown searches, it also renders plausible a claim that the excesses of the August 5 incident, the tampering with Hughes' meals and the attempted interference with this litigation were also retaliatory.

Finally in this area, Hughes has also clearly stated a claim for cruel and unusual punishment against the individual corrections officers. He alleges (and this Court must credit) that food containing "vermin fecal matter" as well as hair, fingernails and rocks was served often enough to cause severe weight loss (Complaint ¶¶ 27(B)-(C), 46(B)). As to the August 5 incident Moldovan assertedly assaulted Hughes without any legitimate reason and then continued to mace him even after he had been subdued (Complaint ¶ 74).

But the destruction of Hughes' legal papers is actionable only insofar as it constituted retaliation, not as a denial of access to the courts. Hughes may well have been prejudiced in this suit or other litigation that he could have brought, but he alleges nothing to that effect.

### Claims Against Baldwin and Williams

It is a familiar principle that "[b]ecause § 1983 does not allow actions against individuals merely for their supervisory role of others, individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue" (<u>Palmer v. Marion</u>

County, 327 F.3d 588, 594 (7th Cir. 2003) (internal quotation marks and citation omitted)). But as Childress v. Walker, 787 F.3d 433, 439-40 (7th Cir. 2015) teaches, despite that requirement that the defendant have caused the deprivation, "personal responsibility is not limited to those who participate in the offending act." Rather Childress, 787 F.3d at 440 (internal quotation marks and citations omitted) continues:

> Liability extends to those who, having a duty under the Constitution to the plaintiff, act or fail to act with a deliberate or reckless disregard of plaintiff's constitutional rights. Liability can also attach if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent. [I]n the context of an excessive force claim, . . . an officer is personally responsible, and thus liable under § 1983, if he knows about another's constitutional violation, has a realistic opportunity to prevent it, but deliberately or recklessly fails to do so. . . . In the case of those responsible for setting policy, liability will result from the institution of a policy that, when enforced, causes a constitutional deprivation.

As to the implementation of a policy, Childress, id. went on to explain that a prison administrator who knew the likely effect of a policy "but nevertheless instituted, condoned, or willfully turned a blind eye" to it has violated the Eighth Amendment.

**Deliberate Indifference**

For Baldwin or Williams to be liable for constitutional violations committed by Moldovan and the John Doe corrections officers, they would have to have failed to prevent them deliberately or recklessly (Childress, 787 F.3d at 440). Any such deliberate indifference claim "has both an objective and a subjective component" (Gevas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015)). Not only must "the harm to which the prisoner was exposed . . . be an objectively serious one" (id.) -- by which is meant one that "results in the denial of the minimal civilized measure of life's necessities" (Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009) (internal quotation marks omitted)) -- but "the official must have actual, and not merely

constructive, knowledge of the risk" (Gevas, 798 F.3d at 480).  As a consequence personal liability under Section 1988 may be established by "[a]n inmate's correspondence to a prison administrator . . . where that correspondence provides sufficient knowledge of a constitutional deprivation" (Perez v. Fenoglio, 792 F.3d 768, 781-82 (7th Cir. 2015)).

At this early stage Hughes has pleaded sufficiently serious allegations in reasonable detail to put Baldwin and Williams on notice of how to craft an answer.  Although the grievance attached to his Complaint covers only Hughes' objections to his jumpsuit, separate housing, small exercise yard, job restrictions and his placement in the Program altogether (Complaint Exs. 1-2) -- matters that, taken alone, do not appear to qualify as objectively seriously risks of harm -- he does state more generally that he filed grievances about the guards' retaliatory conduct and problems with his meals and that Baldwin and Williams were in a position to know about them.  It would be at odds with the notice pleading regime (as contrasted with fact pleading) called for by federal practice if we were to require a plaintiff such as Hughes to attach all evidence to his Complaint or describe it in minute detail -- and that is particularly true where, as here, any such correspondence is likely in the recipients' and not his custody.  Thus the question of what information the defendants actually possessed and what inferences they drew from it must await the results of discovery.

**Free Exercise of Religion**

Hughes protests that his placement in the Program burdened his free exercise of religion in (1) preventing him from attending religious services in person, (2) barring him from meetings with clergy and (3) carrying only one denomination's service on the closed circuit televisions and in only one language.  While he cannot recover monetary damages under the Act or seek equitable relief on any theory, damages are available if those restrictions rose to the level of a

- 12 -

First Amendment violation actionable under Section 1983 (Grayson v. Schuler, 666 F.3d 450, 451 (7th Cir. 2012)).

In that regard Williams v. Lane, 851 F.2d 867, 877 (7th Cir. 1988) reconfirmed more than a quarter century ago that "[p]rison administrators must permit inmates the reasonable opportunity to exercise religious freedom." What qualifies as "reasonable" is analyzed in terms explained by Ortiz, 561 F.3d at 669 (internal quotation marks and citations omitted):

> Prison officials may restrict [an] inmate's ability to practice his faith so long as the restriction is reasonably related to a legitimate penological interest. Legitimate penological interests include security and economic concerns. When officials assert such a concern to justify the curtailment of an inmate's religious exercise, we must consider four factors in determining whether the challenged restriction is constitutional: (1) whether the restriction is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative means of exercising the right that remain open to the inmate; (3) what impact an accommodation of the asserted right will have on guards and other inmates; and (4) whether there are obvious alternatives to the restriction that show that it is an exaggerated response to penological concerns.

And while prisons do not need to furnish identical accommodations for every denomination, they must provide a prisoner with "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts" (Maddox v. Love, 655 F.3d 709, 718-19 (7th Cir. 2011) (internal quotation marks omitted)) -- such reasonableness to be determined when "the totality of the situation is considered." (id.) In short, "[t]he treatment of all inmates must be qualitatively comparable" (id. at 720 (internal quotation marks omitted)). And whether a prison has made reasonable efforts to provide some opportunity for religious practice or was actually justified in treating one sect differently cannot ordinarily be decided at the pleading stage (id. at 720).

Plainly Hughes has stated a claim that is plausible on its face. While Stateville might perhaps have had a legitimate penological reason for preventing him from attending religious

- 13 -

services or meeting with clergy, that reason is not so self-evident as not to require articulation -- and that is especially the case in light of the indefinite and extended period of Hughes' segregation. And any legitimate interest in permitting only one denomination to be carried on the closed-circuit monitors when multiple services are already being conducted for the inmates' benefit undoubtedly calls for scrutiny beyond what is contained in the pleadings, particularly where the closed-circuit services most likely differ from Hughes' choice of worship (as is presumptively the case, given the need to draw reasonable inferences in Hughes' favor on the current motion, coupled with his having complained of the single-denominational nature of the closed-circuit services).

**Hughes' Placement in the Program**

Hughes argues that his placement in the Program violated the Fifth Amendment guaranty against double jeopardy and his Fourteenth Amendment rights to due process and equal protection of the laws. Of those contentions only the due process argument survives to sustain his claim for relief.

### Double Jeopardy

Hughes' appointed counsel are right to "acknowledge[ ] a wealth of case law that seemingly says that prison discipline is not the same as . . . criminal discipline" (H. Mem. 7), but they do not support their follow-up claim that "there is nothing specific on the topic in this circuit" (id.) by attempting to distinguish relevant cases. In particular, the succinct holding in Garrity v. Fiedler, 41 F.3d 1150, 1152 (7th Cir. 1994) undercuts the position they advance:

> Changes in the conditions of incarceration, such as . . . placement in segregation and the extension of his mandatory release date, do not constitute a second punishment for the original offense.

All Hughes complains of is a change in the conditions of his incarceration, so he loses on the double jeopardy issue.

**Equal Protection**

Neither movants nor Hughes address in their respective memoranda the Complaint's Count III, which alleges a violation of the Fourteenth Amendment's Equal Protection Clause. Although movants' failure to raise the issue in their opening brief would ordinarily result in its forfeiture (see, e.g., United States v. Boyle, 484 F.3d 943, 946 (7th Cir. 2007)), such a result is rendered more problematic by the directions in 28 U.S.C. § 1915(e) and § 1915A(b) -- both applicable in this in-forma-pauperis prisoner suit -- to dismiss such a case sua sponte if it appears at any time that the action fails to state a claim on which relief may be granted. Hence this Court must screen Hughes' equal protection claim.

On that subject May v. Sheahan, 226 F.3d 876, 882 (7th Cir. 2000) prescribes the basic operative standard:

> In the prison context, the Equal Protection Clause of the Fourteenth Amendment requires inmates to be treated equally, unless unequal treatment bears a rational relation to a legitimate penal interest. . . . At the motion to dismiss stage, it is premature to make such factual assessments.

That holding is tempered, though, by Wroblewski v. City of Washburn, 965 F.2d 452, 459 (7th Cir. 1992), which reiterated that a court is "not required to ignore facts alleged in the complaint that undermine the plaintiff's claim" that he was treated differently from those similarly situated. Consequently Wroblewski, id. at 460 continued:

> To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications. . . . The complaint's conclusionary assertion that the policy is "without rational basis" is insufficient to overcome the presumption of rationality coupled with the readily apparent justification for the policy.

- 15 -

Hughes emphasizes how he was treated differently from the general prison population, but it must be remembered that he was found with a contraband weapon where others were not, and he does not say that he was treated differently from others punished for similar weapons violations. Nor does he allege sufficient facts to cast doubt on the obvious rationality of subjecting those inmates found with contraband weapons to tighter security. Hughes' insistence that he "is not classified as a security threat group" (Complaint ¶ 68) would not appear to be entitled to credence, given Hughes' allegations about his own conduct and the reason given for his enrollment in the Program.[7]

**<u>Procedural Due Process</u>**

By definition due process challenges can succeed only if defendants have deprived a plaintiff of life, liberty or property (<u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005)). Liberty interests in turn may arise from either "the Constitution itself, by reasons of guarantees implicit in the word 'liberty'" or "from an expectation or interest created by state laws or policies" (<u>id.</u>).

Only state-created liberty interests call for discussion in this case. If the Program violated Hughes' free-exercise right it would also violate due process, of course, but the problem there would not be a lack of notice and hearing. And "[t]he Constitution itself does not create an interest in avoiding transfer within a correctional facility" (<u>Townsend v. Fuchs</u>, 522 F.3d 765, 771 (7th Cir. 2008)).

As to state-created liberty interests, <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995) established that a restraint deprives a prisoner of those only if it "imposes atypical and significant

---

[7] It may be, however, that "security threat group" is a term of art (certainly one unfamiliar to this Court) whose meaning would call for a conclusion different from the one announced here. If so, Hughes' counsel would be entitled to re-raise the issue.

hardship on the inmate in relation to the ordinary incidents of prison life." And in that vein Hardaway v. Meyerhoff, 734 F.3d 740, 743 (7th Cir. 2013) instructs that "an inmate's liberty interest in avoiding segregation is limited."

"Limited" in that context is not a one-size-fits-all term -- as Marion v. Columbia Corr. Inst., 559 F.3d 693, 697 (7th Cir. 2009) (emphasis in original) has put it, the extent of that limited interest depends on "the combined import of the duration of the segregative confinement and the conditions endured." Short terms of segregation (e.g., six months and a day) generally do not implicate a liberty interest unless combined with "exceptionally harsh conditions" (Hardaway, 734 F.3d at 743-44). But where segregation extends for eight months or more, whether a sufficient liberty interest is at stake cannot be determined without the development of a factual record, for as Marion, 559 F.3d at 699 went on to say (emphasis in original), referring to Wilkinson, 545 U.S. at 223:

> [T]he Supreme Court has stated that whether an inmate has a protected liberty interest must be determined from the actual conditions of confinement and not simply from a review of state regulations.

And continued segregation past the date a disciplinary committee initially deemed necessary can violate due process in the rare case that the segregation itself is severe enough to constitute a deprivation of liberty (Thomas v. Ramos, 130 F.3d 754, 760 n.6 (7th Cir. 1997)).

Hughes alleges he was in the Program for 256 days with no definite end in sight and without any periodic review, which surely suffices at this stage of the litigation to implicate a potential liberty interest. It is therefore relevant that no process was afforded him either before or after he was enrolled in the Program.

Now it is true of course that he was placed in the Program because of a disciplinary committee hearing at which he acknowledged having committed a serious rule infraction. And

- 17 -

his suggestion that the committee's final summary created a contractual relationship (Complaint ¶ 38(A)) is too devoid of detail to support an inference that it represented something analogous to a plea agreement. But because Hughes alleges facts that render it plausible that his continued segregation in the Program was severe enough to constitute a deprivation of liberty, he may fall within the exception stated by Thomas, 130 F.3d at 760 n.6. In consequence, on the face of the Complaint it appears plausible that Hughes was not provided adequate procedures for a deprivation of a state-created liberty interest.

## Conclusion

For the reasons given in this opinion, this Court dismisses all claims against Godinez (who is terminated from the case) as well as all prayers for injunctive relief and the contentions stated in Counts I, III and VII of the Complaint. But Hughes is entitled to proceed with his claims against Baldwin and Williams concerning procedural due process, free exercise of religion and deliberate indifference, as well as with his claims against Moldovan and the John Doe defendants arising from the August 5 incident, the tampering with his food and retaliation. This action is set for a status hearing at 9:15 a.m. December 18, 2015 to discuss further proceedings and appropriate scheduling.

_____
Milton I. Shadur
Senior United States District Judge

Date: December 11, 2015